### TEXAS EMPLOYERS' INS. ASS'N v. MELTON. (No. 2241.)

Court of Civil Appeals of Texas. El Paso. Feb. 21, 1929.

Rehearing Denied March 14, 1929.

Harry P. Lawther, Shelby S. Cox, and R. M. Perry, all of Dallas, for appellant.

Caldwell, Gillen, Francis & Gallagher, of Dallas, for appellee.

HIGGINS, J. This is an action in the district court by appellee, Melton, under the Workmen's Compensation Act (Rev. St. 1925, arts. 8306–8309), against the insurer. The first issue submitted was whether Melton, as a result of his injury, suffered the total and permanent loss of the use of his left hand. This was answered in the affirmative, and upon an additional finding as to the average daily wage judgment was rendered in Melton's favor.

Appellant assigns error to the refusal of a peremptory charge in its favor, and also to the refusal of the court to submit questions requested upon the issue presented by the pleading and evidence as to whether the injury was sustained by appellee in the furtherance of the master's affairs or business. Melton and Chester Burrows were employees of the Mid-Kansas Oil & Gas Company, working upon one of its leases in Pecos county. Their duties were to gauge oil tanks, switch oil, and clean the premises around the wells and tanks, saving and salvaging all materials and articles found which might be of value to their employer.

In the late afternoon of December 28, 1927, while cleaning up around a tank, they discovered some dynamite caps on the ground. With reference to what then happened appellee testified: "We were cleaning up the lease, raking up rocks to be hauled off and piling them up, and we found a bunch of dynamite caps there that had been rained on, and they were damp, and we didn't know whether they were any good, and didn't know whether to throw them away or keep them; so we decided to shoot one of them, to see if it was any good, and in lighting this fuse, the wind was blowing and I struck three matches and they went out, and I was trying to' light the fourth match, and the cap went off in my hand, and the explosion tore up my hand. The weather was reasonably fair that day, but it had been raining. By looking at the caps you could not tell whether or not they were good, and the only way to determine that was to shoot one, to see if they were any good."

The explosion of the caps inflicted the injury complained of to plaintiff's hand. Appellee further testified:

"I don't know how many dynamite caps I found there, but there was quite a bunch—10 or 15. There was a pretty good sized roll of fuse lying there. These caps were found within about 40 feet of the well, and within about 10 or 15 feet of where the electric company had a pole in there. They had taken the pole out, but they did not blow it out. I don't know whether the electric company used caps and fuse around there or not; I was not around there when they put up the line. I suppose the caps and fuse belonged to the Mid-Kansas Oil & Gas Company; it was on their lease. It was 10 feet from where this pole was taken up and 40 feet from the well. The Mid-Kansas Company had done dynamiting around this well, but I don't know how long it was before the accident; I was not there.

"Chester Burrows and I had a conversation about these caps, as to what we would do with them; I found them there, and I asked him what they were, and he said he didn't know. We had never seen any dynamite caps before, but I knew what the fuse was, because I had seen fuses before, and we supposed these were dynamite caps. It had been raining, and we decided to shoot one to see it is any good. I don't know who decided to shoot it; we talked about it between us. As near as I can remember, I said, 'Let's shoot one to see if they are any good.' He said, 'Well, try one of them.' He did not have anything to do with the actual shooting of this cap; he was lighting his pipe when it went off, and he was within 4 or 5 feet of me at the time.

"Mr. Lewis was out there that day at noon, but had not been back any more. I guess I could have carried these caps in one hand. I could have left these caps where they were, or put them away somewhere until Mr. Lewis came around again. Nobody had ever told me to shoot dynamite caps, and I had never seen any before. I don't think I had ever heard of anybody else testing dynamite caps to see if they were any good. They were all piled there together, and it looked reasonable that, if one of them was good, all of them would be good."

Chester Burrows testified:

"About 4 o'clock in the afternoon on that day there was an accident to Mr. Melton, and I was present. At that particular time we were raking rocks close to the well, and he run across these dynamite caps, and came to me and asked if we should have them. He said, 'We will shoot one and see if it is good,' and I told him I didn't know what they would do. He was cutting off a piece of fuse, and I was lighting my pipe. I had never seen any dynamite caps, and it went off and tore his fingers all up, and there was blood all over him. He said, 'Why don't you take me to the doctor,' and I took him to the doctor. Blood was all over his shirt. We did not discuss together these dynamite caps before he lit one. I have heard dynamite explode on the premises lots of time. The accident occurred on the premises of my employ-

er near the east No. 1 well. If my employer provided a storage for dynamite and caps before December 28th, I did not know where it was. A day or two before we ran across this dynamite, it had been raining and the weather was damp and cold. You could not determine by looking at the caps whether or not they were good. If the dynamite cap had turned out to be good, we intended putting them in with the good material and turn them in, as the company used dynamite caps. The soil in that vicinity is very hard and rocky. I have heard explosions of dynamite there lots of times."

Cross-examination: "I did not have anything to do with lighting this cap; I knew nothing about the dynamite cap, and did not know what it would do. I didn't agree or disagree with him that was the thing to do; you might say I didn't say anything. He said, 'Shall we light that?' and I think I said, 'I suppose so.' I could not state exactly what I did say, because I was scared that day. * * * These caps were found within about 40 feet of the well. I could not say how many there were of them. They were found within about 10 feet of that pole on the high line. I don't know whose caps they were, but they were on the Mid-Kansas location, and so far as I know they belonged to the Mid-Kansas Company. The high line is also on the Mid-Kansas lease. I could not swear that they belonged to the high line, because I never worked for them, and did not see them shoot any dynamite. Melton and I were not hired to handle dynamite caps, and we didn't know anything about it. We were hired to gauge and switch oil and clean up the premises. They never told me anything about dynamite or caps, and nobody told us to test out any of these caps; but we were to save anything that was good, but how did we know what to throw away; if one was good, the chances were that all of them were good."

H. N. Lewis, farm boss of the employer, and superior of Melton, testified he saw Melton the morning after the accident and further:

"I had a conversation with J. R. Melton at that time in his residence and there was no one present except Mr. Froomer, Mrs. Melton, and myself at that time. Mr. Melton told me at that time that he took one of these dynamite caps and was going to have some fun, and that he put a six-inch length of fuse in the cap and touched a match to it, intending to throw it away like he would a fire cracker. He said at that time it was a fool trick, and that he was ashamed of it; he said it was a 'kid trick.' * * * He was a gauger and switcher of oil, but he had other duties, such as cleaning up around the well, raking up rocks or trash, and anything along that line that needed to be done, and they would do whatever I ordered them to do. If they came across some good timbers, that would be valuable to us in the work, I would want them saved, and if they came across any other material which was of value to me in the work down there, I would want that saved. To look at a dynamite cap and determine whether or not it was good would be pretty hard to do; in fact, a person could not do it. At that time we had no place where dynamite and explosives could be stored. These caps should have been gathered up as a matter of safety. I was interested in Mr. Melton gathering everything up that would help the safety of the camp. I never prohibited any one from gathering up dynamite, and I never prohibited the plaintiff from picking up dynamite, but I never did tell any man to shoot it. I wanted a man who was picking up trash and raking up the premises to use his discretion."

J. J. Froomer, district foreman of the employer, testified:

"I saw Mr. Melton on the following morning at his residence about 7:30, and H. N. Lewis was with me. No one else was there, except Mrs. Melton. I asked J. R. Melton how the accident occurred and I made out the accident papers. He said he found these dynamite caps there and some fuse, and that he cut off about six inches of the fuse and put it in the cap, and he said he was going to shoot this cap and have some fun and throw it away like a firecracker, and it went off in his hand. He said it was just a kid's trick; he said, 'I am really ashamed of it; it was just a kid's trick.' * * * Mr. Melton told us he lighted this like he would a firecracker and was going to throw it away. We don't hold them in our hands when we light them, like you would a firecracker; they light the fuse, of course, but do not hold it in their hands. I tell the foreman what work we want done, and it is up to him to pick the men out for the particular jobs, and he assigns them to the work. It is the policy of the foreman to keep the premises clean, and we salvage good and serviceable material. We use quite a large quantity of dynamite around the camps and on the lease, and we would expect any man working for us to eliminate explosions through dynamite or any other explosives, and we would expect any man working for us not to leave dangerous material around, like dynamite; we would expect any man to prevent an explosion, if he could do so. Our men have all had instructions not to fool with dynamite and dynamite caps, because we have men for that purpose, and nobody else is to do our shooting, except our experienced dynamite men. If one of our men saw dynamite or caps around on the premises, we would expect him to report it; we would expect them to use their judgment and discretion about the matter."

It is appellant's theory the peremptory charge should have been given, because Melton's injury was not sustained in the course

of his employment, for in exploding the dynamite cap he did so out of curiosity and in sport, and not in furtherance of his master's affairs or business.

With respect to the assignments complaining of the refusal to submit the issue as to whether the injury was sustained in furtherance of the master's business, appellee asserts it was not necessary to submit such issue, because the undisputed evidence shows he was injured in furtherance of such business. The evidence quoted shows plainly that, upon discovering the dynamite caps, it was appellee's duty to gather up the same and remove them from the premises. This is shown by the testimony of both Lewis and Froomer.

But, on the other hand, appellee could not be considered as acting in furtherance of his master's business, if, after discovering the caps, he exploded one as a firecracker, simply for his own diversion and amusement, as his statements to Lewis and Froomer the day after the accident would indicate. Such an act was not in furtherance of the master's business, but aside therefrom, and if the injury was sustained in that way he cannot recover under the Compensation Act. 1 Schneider on Workmen's Compensation Law, § 288. The issue should have been submitted, and failure so to do requires reversal.

According to the theory of appellee, he did not explode the cap for his diversion; but his purpose was to ascertain whether they were good, so as to determine whether he should salvage them. If the explosion occurred under those circumstances, he is entitled to recover. Appellee is not to be deprived of the benefit of the Compensation Act because of bad judgment in his effort to discharge his duty to his employer. As was said in Nordyke & Marmon Co. v. Swift, 71 Ind. App. 176, 123 N. E. 449: "* * * An employé who, in an honest attempt to discharge a duty assigned him, does an act incidental thereto not specifically directed, or departs from the usual methods of performing his work, does not thereby necessarily deprive himself or his dependents, of a right to compensation, if injured while so engaged." The peremptory instruction was properly refused.

Appellee in his petition alleged defendant had actual notice of the injury within thirty days after it happened. Notice to the subscriber was not alleged. It is further contended the peremptory charge should have been given, because notice to appellant was not proven as alleged. While the evidence upon the question of such notice is not entirely satisfactory, yet we think the testimony of the witness Gallagher sufficient to show notice to appellant within the thirty-day period.

The ruling upon evidence complained of in the ninth proposition presents no reversible error. However, the evidence seems to have been irrelevant, and the objection thereto should have been sustained.

Reversed and remanded.